IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ERIC JEFFERSON HOBSON          )
                               )
v.                             )          No. 3:11-0737
                               )          Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION )


To:     The Honorable John T. Nixon, Senior Judge


## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration"), through its Commissioner, denying plaintiff's application for disability insurance benefits ("DIB"), as provided under the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 12), to which defendant has responded (Docket Entry No. 15). Plaintiff has further filed a reply brief in support of his motion. (Docket Entry No. 17) Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 10),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be GRANTED and that the decision of the SSA be REVERSED and the cause REMANDED for further proceedings consistent with this Report, to include rehearing.

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

# I. Introduction

Plaintiff filed his DIB application on April 14, 2008, alleging disability onset as of April 2, 2006, due to seizures, head tumor, asthma, and allergic rhinitis. (Tr. 32, 94-96, 110) These applications were denied at the initial level of review before the state agency, and then again on reconsideration before that agency. Plaintiff thereafter filed his request for de novo hearing of his claim to benefits by an Administrative Law Judge ("ALJ") of the SSA's Office of Disability Adjudication and Review. A video hearing was held before ALJ Frederick McGrath on February 23, 2010. (Tr. 24-30) Plaintiff appeared with counsel and gave testimony. Thereafter, the ALJ took the matter under advisement, until April 27, 2010, when the ALJ issued a written decision denying plaintiff's disability claim. (Tr. 11-18) That decision contains the following enumerated findings:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2008.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of April 2, 2006 through his date last insured of September 30, 2008 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: migraine headaches, seizure activity, probable benign occipital osteoma and asthma (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels that does not require the climbing of ladders/ropes/scaffolds or driving. The undersigned determines

2

that the claimant should avoid concentrated exposure to fumes, odors, gases, dusts and poor ventilation. The undersigned also concludes that the claimant is not able to work around unprotected heights or dangerous machinery. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If an individual can do heavy work, it will be determined that the individual can also do medium, light, and sedentary work. (20 CFR 404.1567(d)).

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on November 18, 1983 and was 24 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1520(g)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from April 2, 2006, the alleged onset date, through September 30, 2008, the date last insured (20 CFR 404.1520(g)).

(Tr. 13-14, 16-17)

On June 10, 2011, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction.

3

42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The following record review is taken from defendant's brief (Docket Entry No. 15 at 2-8), and further review of the relevant evidence is provided in the legal discussion that follows this section, infra at pages 14-17, where plaintiff's history of treatment for headache pain in particular, as well as his brief hearing testimony, is reviewed.

During the period of 2006 to 2009, plaintiff received treatment from Tennessee Valley Healthcare System and the Veterans Administration Medical Center (VAMC). On March 19, 2006, plaintiff underwent a "C&P [compensation and pension] exam for generalized seizure disorder and respiratory disorders" (Tr. 177-81). Plaintiff stated he had a history of general seizure disorder, migraine headaches, asthma, and allergic rhinitis (Tr. 177). Plaintiff reported his first seizure occurred approximately two years earlier and he was diagnosed with generalized seizure disorder possibly secondary to osteoma (id.). He reported approximately four to five seizures a week, "near constant headaches" and "near excruciating" migraines that are precipitated by light (id.). He also complained of allergic rhinitis and asthma attacks approximately twice a week that he treats with Albuterol (id.). A CT of his head on January 4, 2005, showed a "well circumscribed ossific lesion off the high posterior left frontal bone most consistent with benign osteoma of the skull" (id.). Following a physical examination, plaintiff was assessed with a generalized seizure disorder and migraine headaches that are "currently being followed and treated by neurology" and asthma

4

(Tr. 178). On April 3, 2006, plaintiff had no restriction in his lung volumes during pulmonary function testing (Tr. 179-80).

Plaintiff did not seek further treatment until more than nine months later on January 24, 2007; at that time he was seeking a medication refill (Tr. 186-87). Plaintiff reported a rash on the soles of his feet, two to three migraine headaches a week, and three to four seizures a week (Tr. 186). Plaintiff "denie[d] any other complaints" (id.). He said he had been out of medication for "some time" (Tr. 186). The physician noted that plaintiff "was seen by neurology last year with a normal EEG" (Tr. 187). The physician assessed plaintiff with a seizure disorder (id.). The physician increased the dose of seizure medication, instructed plaintiff to follow-up with neurology, and instructed plaintiff to refrain from driving (Tr. 187). The physician noted that plaintiff's asthma was under control (id.).

Plaintiff returned to Tennessee Valley Healthcare System on February 16 and March 13, 2007, complaining of low back pain and burning on urination (Tr. 183-85). Plaintiff did not mention any complaints associated with seizures and headaches during either visit (id.). Physical exams on both dates revealed his extremities had 5/5 strength, his deep tendon reflexes were 2+, and his back had full range of motion (id.). CT scans of his abdomen, pelvis, and lumbar spine were unremarkable on February 16, 2007 (Tr. 185, 190-92). Plaintiff was assessed with a urinary tract infection on February 16, 2007 (Tr. 184), and with "low to middle back pain secondary to possible muscle spasm [and/or] possible bladder spasm" on March 13, 2007 (Tr. 183).

In a letter dated June 12, 2007, the Department of Veterans Affairs (VA) certified that plaintiff "is in receipt of disability compensation on account of service-connected disability" with plaintiff disabled at 70%, but "being paid at the rate of 100% due

5

to unemployability" (Tr. 235).

Plaintiff did not return for a follow-up until approximately nine months later on December 12, 2007 (Tr. 181-83). Plaintiff had "several missed visits" to the clinic and had "missed his scheduled app[ointmen]t with neurology" (Tr. 181). Plaintiff reported he continued to have two to three seizures a week and "frequent migraines most days of the week" (id.). The physician told plaintiff that "he needs to work with his neurologist on better control" (id.).

Plaintiff sought no further treatment until after a May 19, 2008, consultative examination by Dubir Prasad, M.D., for the Tennessee Disability Determination Services (DDS) (Tr. 215-18). Plaintiff reported a history of constant headaches that vary in intensity, migraines, seizures approximately three to five times a week, and a benign tumor (Tr. 215-16). Plaintiff reported that Zomig provides some headache relief (Tr. 215). He also reported that he had been receiving neurological care at the VA hospital in Nashville (Tr. 216).

Dr. Prasad's head, ear, eye, nose and throat exam revealed no evidence of any acute head trauma, but he did have a three to four centimeter raise in the left medial occipital area that is consistent with an osteoma (Tr. 217). His fundi revealed sharp disc margins, the external auditory canals were normal, and his oropharynx revealed no tongue or lip lacerations (id.).

Dr. Prasad's neurological exam revealed:

cranial nerves and pupils to be 4 mm, reactive down to 2. Visual fields were by counting. He had good extraocular movements. There was no nystagmus. He reported no difference in light touch on both sides of the face. There is no upper facial weakness nor any lower facial droop. No ptosis was noted. No Horner's syndrome was apparent. Tongue and palate were midline. Jaw, neck and shoulder strength were normal. Motor power found 5/5 strength on all 4

6

extremities. There was no pronator drift. Reflexes 2+, symmetric. Both plantar responses were flexor. There was no clonus. He reported no significant loss in vibration or pin prick from left to right, nor at the toes versus the knees. Proprioception was preserved. Finger-nose-finger and heel-to-shin were quite accurate.

(id.).

Dr. Prasad diagnosed plaintiff with (1) headaches, presumably migraine; (2) spells that are "[s]omewhat atypical for epileptic seizures," and (3) "[p]robable benign left occipital region osteoma." (Tr. 218). He noted that plaintiff's osteoma was "unlikely to be a seizure focus" (id.). Dr. Prasad assessed that plaintiff should "not drive, climb ladders or operate dangerous machinery due to his spells. Otherwise, no impairment-related limitations are noted" (id.).

The next day, plaintiff underwent a pulmonary function test (Tr. 219-25). The results were normal (Tr. 219).

On May 29, 2008, Mary Payne, M.D., DDS, opined that plaintiff was able to perform work activity without any exertional limitations, however, he was unable to climb ladders, rope, or scaffolds; he could only frequently perform all other postural activities; and he should avoid hazards (Tr. 227-30).

The next treatment reports of record are dated December 16, 2008 (Tr. 298-302), and March 24, 2009 (Tr. 289-95). Plaintiff visited the VA Medical Center Emergency Department for treatment for a sore throat on December 16, 2008 (Tr. 299), and probable viral gastroenteritis on March 24, 2009 (Tr. 292). Plaintiff did not seek or obtain any treatment for seizures or headaches during these visits (Tr. 289-95).

On June 5, 2009, plaintiff re-visited the VA Medical Center Emergency

Department requesting medication to treat a headache (Tr. 284). The emergency room physician noted that plaintiff "hasn't been seen by neurology since 2/05 and hasn't been seen by primary care since 12/07" (id.). Plaintiff reported exacerbation of his chronic migraines, but denied vision changes, floaters, neurological changes, nausea and vomiting (id.). Plaintiff had "[n]o recent seizure activity [and n]o change in headaches from baseline pain" (id.). A full examination was not completed because plaintiff became uncooperative and interested in leaving after the physician told him that only routine acute migraine treatment was being recommended, and he "didn't feel narcotics were indicated at this time" (id.). Plaintiff requested Lortab and reported he had been taking Lortab for joint pain and that it helps with his migraines (Tr. 286). Plaintiff was offered other non-narcotic migraine treatment, but he refused these treatments (Tr. 285). Plaintiff was advised to follow-up with his primary care physician to discuss other pain options (id.). The incomplete results from the examination revealed that plaintiff's cranial nerves II-XII were grossly intact, his strength was 5/5 in the upper and lower extremities, and he was alert and oriented (Tr. 285).

Five days later, plaintiff returned to the VA Medical Center Emergency Department complaining of headache pain at 10/10 due to a benign tumor and seizures two to three times a week (Tr. 276-83). Plaintiff said he did not want surgery to treat the tumor because he has five young children and "does not want to risk being disabled" (Tr. 276). Plaintiff was taking Zomig and Amitriptyline, but discontinued taking them due to hives and abdominal pain (id.).

Approximately one month later, on July 8, 2009, plaintiff returned to the neurology clinic (Tr. 274-75). Plaintiff reported having seizures and headaches since 2003, but he "was last seen in clinic in 2005" (Tr. 274). Plaintiff indicated his seizures occurred

three to four times a week without falling, except for once (id.). An EEG in 2005 was normal (id.). A CT scan showed an osteoma (id.). Plaintiff was assessed with a history of migraines, daily headaches, and frequent spells concerning for complex partial seizures (Tr. 275-76). The physician noted that "[g]iven the extracranial location of his osteoma, it would seem unlikley [sic] to be related to this, however will re-image given the fact that the patient thinks it is growing" (id.). Plaintiff was advised to begin Topamax for his seizures and migraines and to undergo another CT scan to evaluate the osteoma (Tr. 276).

Plaintiff returned to the clinic one week later complaining of headache pain at 9/10 (Tr. 271-73). Plaintiff reported he had only one seizure since he began Topamax (id.). A neurological exam revealed his cranial nerves II-XII were grossly intact, he had a normal gait, and his strength was 5/5 throughout (Tr. 273). Plaintiff was advised to undergo a CT scan of his brain and to follow-up with neurology (id.).

On August 4, 2009, plaintiff underwent an EEG evaluation to determine the cause of his reported history of "2 - 3 spells of tightening his muscles and loss of memory per week" (Tr. 249, 269). The results showed a "[n]ormal waking and drowsy EEG" (Tr. 250, 269).

Plaintiff returned to the neurology clinic for a routine follow-up on October 1, 2009 (Tr. 266-68). Plaintiff reported a history of seizures and headaches since 2003 (Tr. 266). Prior EEG and MRI scans were normal (id.), and a repeat CT scan during his last visit showed his continued osteoma (id.). Plaintiff reported doing better since his last visit (Tr. 267). He had "been seizure free for 21 days" (id.). Although he continued to have headaches, the pain level of his headaches had decreased (id.). Plaintiff was referred for a MRI of the brain to search for possible intracranial lesions that could be the cause of his headaches (Tr. 268).

On October 7, 2009, plaintiff returned to the primary care clinic for a routine follow-up visit (Tr. 261-66). Plaintiff continued to report headaches, but he had not had a seizure in twenty-four days (id.). A CT exam of his head on July 22, 2009, showed "2.3 cm x 1.1 cm diameter osteoma of the left parietal calvarium; no acute intracranial abnormalities appreciated" (Tr. 237-38, 261). Plaintiff was assessed with a benign osteoma that is likely the cause of his headaches (Tr. 264). Plaintiff was referred again for a brain MRI (id.).

On October 26, 2009, plaintiff underwent an MRI of the brain (Tr. 236-37). The results showed "[a n]ormal noncontrast MRI of the brain ... [and] bilateral maxillary sinusitis" (Tr. 236). The physician described the MRI results as indicative of a "minor abnormality" (Tr. 237).

On December 16, 2009, plaintiff returned to the primary care clinic for a follow-up visit (Tr. 256-59). Plaintiff reported significant improvement with his headaches after starting Tylenol 3 (Tr. 256). He had only one seizure since he began Topamax three months earlier (id.). Plaintiff noted he is being "[f]ollowed with neurology and [is] very happy with his care" (id.). Three days later, plaintiff reported that the pain on the left side of his head was only at 1/10 (Tr. 260).

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence

but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)).  Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached.  Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  Id. at § 423(d)(3).  In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations.  Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be

11

found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

      The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

      In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483,

490 (6th Cir. 1988).

## C. Plaintiff's Statement of Errors

Plaintiff argues that the ALJ erred in failing to properly consider his case against the criteria of Listings 11.02 and 11.03, at the third step of the sequential evaluation process. He further contends that the ALJ erred at the fourth step of the sequential evaluation process by not considering the VA award of 100% disability, by mis-evaluating the evidence of plaintiff's medically determinable impairments and their impact on his RFC, and by improperly discounting the credibility of plaintiff's subjective pain complaints. Finally, plaintiff argues that the ALJ erred in relying exclusively on the grid rule framework in making his step five determination, rather than obtaining vocational expert (VE) testimony to assess, in a manner individualized to plaintiff, the vocational impact of his significant nonexertional limitations. As further explained below, the undersigned finds that the ALJ did commit reversible error at the fourth and fifth steps of his review, and thus concludes that this matter should be remanded for further consideration before the agency.

Plaintiff perfunctorily argues that the ALJ failed to properly consider whether he meets or medically equals the criteria of Listing 11.02 and/or 11.03, because he "has a long history of documented seizures, despite medication compliance." (Docket Entry No. 12-1 at 8) However, the ALJ explicitly considered the criteria of Listing 11.02 in his opinion (Tr. 14), consistent with plaintiff's report of convulsions with his seizures (Tr. 126, 215, 231). (Listing 11.03 applies to nonconvulsive epilepsy.) In any event, plaintiff has never been diagnosed with epilepsy, but only with "spells" that are somewhat atypical of epileptic seizures (Tr. 218)

13

or with a generalized seizure disorder with normal EEG results (Tr. 178-79, 187, 234).

Without an established epilepsy diagnosis, plaintiff's case would not be appropriately

determined under the epilepsy listings. Mann, ex rel. A.W. v. Astrue, 2011 WL 2784566, at

*8 (N.D. Ohio July 15, 2011) (citing Coleman v. Astrue, 2010 WL 28567 (M.D. Tenn. Jan. 5,

2010)). Accordingly, the ALJ appropriately found no listing-level impairment, and

proceeded to consider the symptoms and limitations imposed by plaintiff's generalized

seizure disorder at subsequent steps of the sequential evaluation process.

   It is at those subsequent steps where the ALJ committed error in discounting

the credibility of plaintiff's subjective report of symptoms. In particular, the ALJ does not

address in any meaningful way the effect of plaintiff's severe migraine headaches during the

time period at issue. Plaintiff alleges the onset of disability as of April 2, 2006, and his date

last insured for Title II benefits is September 30, 2008. During this roughly 2 ½ year period

at issue here, plaintiff consistently complained to his treating sources at the VA clinic of

migraine headache pain and associated difficulties. Before, during, and after plaintiff's

insured period, he was noted to have a benign osteoma of the outer portion of the skull, i.e.,

a bony tumor "of the left parietal calvarium measuring 2.3 cm in transverse dimension and

approximately 1.1 cm in height" (Tr. 238), which was at one point cited as the "likely cause

of [his] headaches[.]" (Tr. 264) He was followed by the VA neurology department for

treatment of his migraine headaches, and entered the period at issue here already on a

treatment regimen, with the VA note of a "C&P exam" describing this condition as of March

18, 2006: "He says migraine[s] are precipitated by light, near excruciating. He is currently

seen by neurology for this as well and takes zolmitriptan as an abortive and amitriptyline as a

preventive agent. He complains of near constant headaches that limit his ability to be

employed." (Tr. 177)  Plaintiff apparently remained on this treatment regimen, with only limited success in controlling his headaches, for the duration of the period at issue here, and through July of 2009.  While there are no treatment notes for the remainder of 2006 after the C&P exam, VA records indicate that plaintiff was seen by, or made contact with, the neurology department in June 2006.  (Tr. 197)  In January 2007, plaintiff was seen in the VA primary care clinic with complaints of, e.g., 2-3 migraines per week, and having run out of his medications some time ago.  (Tr. 186)  His prescriptions for amitriptyline and zolmitriptan were renewed, and midrin was added for non-narcotic pain control.  These prescriptions, at least for amitriptyline and zolmitriptan,  appear to have been refilled via contacts made with the primary care clinic in May and August 2007 (Tr. 196), as at plaintiff's next clinic visit, in December 2007, these medications were listed as current (Tr. 202); upon plaintiff's complaint of continued frequent migraines partially relieved by Zomex (zolmitriptan), the physician added metoprolol for headache suppression and reglan for abortive therapy, while maintaining the amitriptyline and zolmitriptan prescriptions.  (Tr. 202)  There are no records of further evaluation of plaintiff's migraines in 2008, but only one reference to a visit to the VA neurology department on July 22, 2008.  (Tr. 175)  Presumably plaintiff continued his use of prescribed medications during this time.

The record reflects that plaintiff was awarded disability benefits by the Department of Veterans Affairs on December 1, 2006, according to its determination that plaintiff is 70% disabled, although such benefits were "paid at the rate of 100% due to unemployability."  (Tr. 235) By letter dated May 6, 2009, the VA clarified that this 100% pay rate was allocated among plaintiff's diagnoses of migraine headaches (50%), generalized seizure disorder (40%) and asthma (10%).  (Tr. 234)

15

On May 19, 2008, plaintiff was seen for a consultative examination by Dr. Dubir Prasad, M.D. (Tr. 215-18) Dr. Prasad noted plaintiff's osteoma in the left medial occipital area. (Tr. 217) After reciting plaintiff's report of headache symptoms including "'pounding' pain that seems to start in the left temporal occipital area, but can spread to the whole cranium and had associated nausea, photophobia, phonophobia and kinesophobia[,]" Dr. Prasad diagnosed plaintiff with presumed migraine headaches, but assigned no limitations owing to such impairment. (Tr. 215, 218) He further noted plaintiff's report that "[o]ver-the-counter medicines have not helped[;] Prescription medicines including Zomig provide some relief[;] He tells [me] he gets a headache constantly though it varies in intensity[;] He has been diagnosed with migraines and has been tried on different agents without complete relief." (Tr. 215)

Approximately eight months after the expiration of his insured period, plaintiff was seen in the emergency room on June 5, 2009, complaining of exacerbation of his headaches and requesting Lortab (a narcotic pain medication) to treat them. He reported that he had been prescribed Lortab for treatment of joint pain, and that it had been effective in relieving his headaches. (Tr. 286) He complained that the Zomig, metoprolol and nonsteroidal anti-inflammatories he had been prescribed in the past were not effective. (Tr. 284) When informed that acute migraines were routinely treated with "ergot, triptans, NSAIDs etc." but not with narcotics, and that such routine treatment was all that would be offered in his case, plaintiff declined the attending physician's offer of such further, non-narcotic treatment. (Tr. 285) Shortly thereafter, plaintiff developed a rash and pruritic hives which were described as an allergic reaction to his amitriptyline and Zomig. (Tr. 278-82)

16

On July 15, 2009, plaintiff was seen in the primary care clinic with head pain, and his osteoma was extremely tender to the touch.  (Tr. 271, 273)  His headache pain medication was changed to Tramadol (a non-narcotic, central nervous system drug), in addition to the prophylactic medication metoprolol.  (Tr. 272-73)  While the Tramadol was moderately effective in relieving plaintiff's migraine headache pain, it had to be discontinued because of its potential to lower plaintiff's seizure threshold.  Given the "medication refractory" nature of his acute headaches, the VA neurologist ordered a brain MRI to look for an intracranial lesion.  (Tr. 268)  In the fall of 2009, plaintiff's primary care physician noted that of all the headache medications he had tried, only Tylox (a narcotic) and Tramadol had been particularly effective; still reluctant to prescribe narcotics, the physician prescribed a month's worth of Fioricet (a combination of a barbiturate, caffeine, and acetaminophen) to "see how he does."  (Tr. 264)  This medication was evidently not effective, and in November 2009, Tylenol 3 (a combination of acetaminophen and the narcotic codeine) was prescribed by the neurologist to control plaintiff's breakthrough headache pain.  (Tr. 256, 259)  In December 2009, plaintiff reported significant improvement in his headaches since being prescribed Tylenol 3.  (Tr. 256)

As to the ALJ's finding on the credibility of plaintiff's subjective complaints of pain, he properly invoked the rubric established in, e.g., 20 C.F.R. § 404.1529.  (Tr. 20-21) Upon finding "a medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms," the ALJ is required to then evaluate the intensity and persistence of those symptoms by reference to the record as a whole, including both the objective medical evidence and other evidence bearing on the severity of the claimant's functional limitations.  20 C.F.R. § 404.1529(c)(1)-(3).  There is no question that a claimant's

17

subjective complaints can support a finding of disability -- irrespective of the credibility of that claimant's statements before the agency -- if they are grounded in an objectively established, underlying medical condition and are borne out by the medical and other evidence of record. Id.; see, e.g., Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997); SSR 96-7p, 1996 WL 374186, at *1, 5 (describing the scope of the analysis as including "the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record[;]" "a finding that an individual's statements are not credible, or not wholly credible, is not in itself sufficient to establish that the individual is not disabled."). Such "other evidence" which the ALJ is bound to consider includes evidence of the following factors:

>(i) Your daily activities;
>
>(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
>
>(iii) Precipitating and aggravating factors;
>
>(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
>(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
>(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
>(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

18

Here, after reciting the above standard governing his consideration of plaintiff's credibility, the ALJ found as follows:

> . . . In his adult disability and function reports, the claimant reported that he suffered from seizures, a head tumor, asthma, severe pain and breathing problems. The claimant noted that he experienced difficulties with seeing, lifting, squatting, bending, standing, walking, kneeling and climbing stairs. However, the claimant also noted that he is able to assist his children with their homework; to care for his own personal needs; to prepare simple meals; to shop; to manage funds/pay bills; to concentrate; to understand the spoken word; to get along with authority figures and to handle stress and/or changes in routine. This evidences that the claimant is able to function.
>
> . . . [T]he medical evidence showed that the claimant's medical condition improved with treatment and that many of the claimant's objective medical tests were negative/normal/unremarkable. Although the claimant's received treatment from VAMC for asthma/seizures/migraines, longitudinal records of physical examinations of the claimant were essentially unremarkable. In addition, the claimant underwent several objective tests such as spirometry, CT scans, magnetic resonance imaging (MRI) brain scans and electroencephalograms (EEG) and chest x-rays, which were all normal/unremarkable with the exception of showing a benign osteoma. . . . In addition, on December 16, 2009, it was reported that the claimant's headaches had significantly improved/were well-controlled and that the claimant had had only one seizure with his medications. This contradicts the claimant's assertion that he experiences several seizures per month and evidences that the claimant's condition improved with treatment modalities. . . .

(Tr. 15)

There is clearly an underlying medical condition giving rise to plaintiff's subjective report of pain: migraine headaches likely caused or exacerbated by plaintiff's cranial osteoma. Despite the fact that objective film study did not reveal any intracranial lesions accounting for plaintiff's poor response to the routinely prescribed migraine

19

medications, his physicians did not in any way articulate that they doubted plaintiff's report of migraine symptoms. Rather, the neurologists and primary care physicians at the VA continued to prescribe a combination of medications for his migraines, with adjustments made at intervals in an attempt to relieve his symptoms without resorting to narcotic pain medication, before finally adverting to narcotic therapy in 2009, with good results. That plaintiff's condition reportedly "improved with [such] treatment modalities" in late 2009 -- more than a year after plaintiff's date last insured -- is only relevant to the analysis of his pain during his insured period insofar as it demonstrates his apparent need for narcotics at that time, thus bolstering his claim of severe pain. Moreover, the fact that plaintiff was capable of performing such minimal daily activities as, e.g., caring for his personal needs and preparing simple meals, does not support a finding that his pain was not disabling. Gill v. Shalala, 5 F.3d 545 (10th Cir. 1993). In fact, during the period at issue, there does not appear to be any legitimately conflicting evidence on the issue of pain in the record, a point which the Sixth Circuit has deemed significant. King v. Heckler, 742 F.2d 968 (6th Cir. 1984). Lastly, while not in any way binding on the SSA, it is certainly noteworthy that the VA awarded plaintiff benefits based on its determination of his unemployability, owing to the combined effect of his migraines, seizures, and asthma (of which plaintiff's migraines were the most significant factor in the VA disability calculus).

       While significant deference is generally due an ALJ's findings involving the credibility of a disability claimant, this deference is particularly due because of the ALJ's opportunity to observe the claimant's demeanor while testifying, an opportunity which the courts do not have. E.g., Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003). However, in this case, the videoconference in which plaintiff's case was heard lasted fifteen

minutes according to the transcriptionist's account of the starting and stopping times, though there is not fifteen minutes worth of dialogue transcribed -- while not made explicit in the transcript, it appears that the ALJ may have spoken with plaintiff's counsel off the record for several minutes after opening the hearing. (Tr. 24 ("I want to speak to your attorney for a few minutes.")) Moreover, the ALJ did not examine plaintiff, but was content to let counsel ask the questions. Of the four transcribed pages containing this examination by counsel, only the following colloquy pertains to plaintiff's pain:

Q      Okay. And as far as these headaches, how often do you have these headaches?

A      I have a headache every day, all day.

Q      And what do you use to help your headaches?

A      I take three different medications. But the one that they gave me the most is
       Tylenol 3, and I take that to offset the pain when the pain is really bad because
       I'm also light sensitive and sound sensitive when they get really bad.

Q      And that's what causes -- intensifies the headaches?

A      Yes.

Q      Light and sound?

A      Yes.

Q      The medicines for the headaches and the seizures are there -- do you have any
       side-effects as you know of?

A Not that I know of other than extreme drowsiness and weakness, but that's about it.

Q Is that on a daily basis?

A Yes, sir, it is.

(Tr. 28) The ALJ failed entirely to discuss the alleged medication side effects mentioned above, including to what extent those side effects occurred during the period at issue here, prior to the introduction of narcotic pain medication; plaintiff had earlier reported drowsiness and weakness as side effects of amitriptyline. (Tr. 114) In short, the ALJ's credibility determination is not supported by substantial evidence, and is not deserving of deference under these circumstances.

  Because the extent of plaintiff's nonexertional impairments, particularly his migraine pain, was not appropriately analyzed, their impact on his ability to perform a full range of work at any given level of exertion was not adequately considered. Thus, the ALJ's reliance on the grids alone to carry his step five burden of demonstrating the availability of other jobs in the economy which plaintiff could perform, cannot be sustained. See Kimbrough v. Sec'y of Health & Human Servs., 801 F.2d 794, 796-97 (6th Cir. 1986). Certainly, the combined effects of plaintiff's asthma and generalized seizure disorder -- which produced a level of impairment significant enough to require workplace environmental restrictions -- as well as his migraine headache symptoms (which the record evidence appears to corroborate as largely unremitting despite various medications during his insured period), are sufficient to have precluded reliance upon the grids alone to

22

establish the existence of other jobs. The ALJ's finding to the contrary is not supported by substantial evidence.

In sum, the decision of the SSA is not supported by substantial evidence, and the undersigned therefore concludes that reversal and remand to the agency are in order in this case.

## IV.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be GRANTED, and that the decision of the SSA be REVERSED and the cause REMANDED for further proceedings consistent with this Report, to include rehearing.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

ENTERED this 2nd day of May, 2013.

  s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE

23